Kourosh A. DASTGHEIB, Plaintiff,

v.

GENENTECH, INC., Defendant.

Civil Action No. 04–1283.

United States District Court,
E.D. Pennsylvania.

July 10, 2006.

Brady J. Fulton, John C. Janka, Paul K. Vickrey, Raymond P. Niro, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL, Sheldon Kivell, Steven R. Waxman, William H. Ewing, Eckert Seamans Cherin & Mellott LLC, Philadelphia, PA, for Plaintiff.

Craig A. Benson, Kenneth A. Gallo, Paul Weiss Rifkind Wharton & Garrison LLP, Washington, DC, Daniel J. Anders, Laurence Z. Shiekman, Pepper Hamilton LLP, Philadelphia, PA, John Vagelatos, Maria T. Vullo, Paul Weiss Rifkind Wharton & Garrison LLP, New York, NY, for Defendant.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

Before the Court is defendant's motion in limine to exclude the expert testimony of plaintiff's proposed expert economist, Joseph Gemini. For the reasons that follow, defendant's motion will be granted in part and denied in part.

## I. BACKGROUND

Mr. Gemini's opinions can be summarized as follows:

1. "Since Dr. Dastgheib's submissions (which Genentech is alleged to have wrongfully obtained) were critical in Genentech's project to develop an anti-VEGF drug for the treatment of AMD, it is my opinion that the PTS adjusted NPV of Lucentis [ ($3.10 billion) ] can presently be deemed wrongfully obtained benefit subject to disgorgement as unjust enrichment damages." (Supp.Exp. Rep.29.)

2. "In my opinion, at a minimum, the benefit of a shortened life of the AMD project would increase the value of this AMD project resulting from the ability to move forward more quickly.... Estimates indicated that a shift out of the launch date could cost [$332 million] in value for 1 quarter and [$628.6 million] for two quarters...." (Exp. Rep. ¶¶ 43–44; Sec. Supp. Exp. Rep. ¶ 32.)

3. "Assuming liability under [the North Carolina unfair and deceptive trade practices claim], and assuming that Dr. Dastgheib is entitled to immediate payment of the full value of the contract based upon future revenues, it is my opinion that the total present value ... of this expected royalty stream discounted to today is ... $55.63 million adjusted for [probability of technical success]," or $166.89 million if treble damages is awarded. (Sec.Supp.Exp.Rep.¶¶ 38–39.)

4. "I understand that the damages for fraud would be measured by the difference between what was received by Dr. Dastgheib, which was nothing, and what Genentech promised him, which was 1% of the Lucentis revenues.... Assuming liability under the fraud claim, and assuming the Dr. Dastgheib is entitled to immediate payment of the full value of what Genentech promised him based on future revenues, it is my opinion

that the total present value of this expected royalty stream discounted to today is ... $55.63 million adjusted for [probability of technical success]," plus punitive damages. (Sec. Supp.Exp.Rep.¶ 41.)

Defendant contends that Mr. Gemini's opinions, with respect to damages for (A) unjust enrichment, and (B) the North Carolina unfair trade practices and fraud claims, are inadmissible under Rule 702.[1]

## II. DISCUSSION

### A. *Unjust Enrichment*

■ Defendant argues that Mr. Gemini's opinion that plaintiff is entitled to the entire value of the Lucentis project as a damages remedy for unjust enrichment should be precluded under the reliability requirement of Rule 702. Defendant believes that Mr. Gemini erred in that he "has not even attempted to quantify the value of the Dastgheib materials, separated and apportioned from the contributions that others made to the project." (Def.'s Br. 6.) Defendant contends that as a matter of North Carolina law, plaintiff is not entitled to the value of the entire Lucentis project even if Mr. Gemini is to assume that plaintiff's contributions were "necessary" for the development of Lucentis.

Defendant directs the Court to a litany of cases, only two of which could potentially assist the Court in predicting how the North Carolina Supreme Court would decide the apportionment issue with respect to unjust enrichment damages: (1) *Metric Constructors, Inc. v. Bank of Tokyo–Mitsubishi, Ltd.*, 72 Fed. Appx. 916 (4th Cir. 2003) (unpublished), and (2) *Fed. Deposit Ins. Corp. v. British–Am. Corp.*, 755 F.Supp. 1314 (E.D.N.C.1991).[2] *See, e.g., Debiec v. Cabot Corp.*, 352 F.3d 117, 128 (3d Cir.2003) (the role of a court sitting in diversity is to predict how the supreme court of the relevant state would decide the case).

Defendant heavily relies on the Fourth Circuit case of *Metric*, 72 Fed.Appx. 916. In *Metric*, plaintiff construction company contracted with Carolina Energy, Limited Partnership ("CELP") to build a facility that would convert solid waste into fuel and recyclable materials. *Id.* at 918. CELP entered into a separate project financing agreement with a bank, the defendant in the case. *Id.*

Under the construction contract between CELP and plaintiff, CELP would make "progress payments" to plaintiff. *Id.* Having few assets of its own, CELP never paid plaintiff directly. *Id.* Instead, CELP submitted an application to the bank for release of funds to pay plaintiff. *Id.*

There were no problems for the first nine months of construction, at which time

---

1. Rule 702 governs the admissibility of expert testimony. Rule 702 provides:

   If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed.R.Evid. 702.

2. The remainder of the cases deal with statutory damages available in cases of intellectual property infringement and not unjust enrichment, *see, e.g., Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*, 225 U.S. 604, 32 S.Ct. 691, 56 L.Ed. 1222 (1912), or discuss damages for unjust enrichment in jurisdictions outside of North Carolina, *see, e.g., In re Rezulin Prod. Liab. Litig.*, 392 F.Supp.2d 597, 619 (S.D.N.Y.2005). While insightful, these cases will not assist the Court in predicting how the North Carolina Supreme Court would decide this issue.

the bank became concerned about the continued financial viability of the project. *Id.* at 919. The bank made the October payment to plaintiff for the previous month's work, but did not make the November payment for October's work. *Id.* However, neither CELP nor the bank alerted plaintiff of the pending financial concerns. *Id.* Plaintiff thus continued construction until mid-December, at which time CELP notified plaintiff that defendant bank had ceased funding on the project. *Id.* at 919–20. Plaintiff stopped work for non-payment and brought an unjust enrichment suit against the bank (not CELP), seeking the value of the benefit conferred on the bank for plaintiff's uncompensated work from October until mid-December. *Id.* at 920.

Before the Fourth Circuit was the appropriateness of plaintiff's claim for unjust enrichment under North Carolina law. With respect to damages, the court held,

> The restitution to be made for unjust enrichment is measured according to the value of the benefit conferred on the defendant, not the plaintiff's loss. *Booe,* 369 S.E.2d at 556. In this case, the value of the benefit conferred on the Banks should be measured as the amount by which [plaintiff's] additional work from October through mid-December enhanced the value of the Bank's collateral. *See Britt,* 359 S.E.2d at 470.

*Metric,* 72 Fed.Appx. at 923.

Defendant believes that in limiting restitution damages to 2.5 months, from October through mid-December, *Metric* supports their position that the jury must determine the value of plaintiff's materials to defendant, "separate and apart from the value of the rest of the project." (Def.'s Br. 6–7.) The Court does not agree with defendant's interpretation. *Metric* had nothing to do with apportionment of profits or separating out third-party contributions. Instead, the Fourth Circuit limited

damages to the enhanced value equivalent to plaintiff's work for a 2.5–month period because plaintiff was already paid for the work for the prior months, not because of another party's contribution. The *Metric* case simply did not deal with the apportionment issue now before this Court.

This interpretation of *Metric* is further supported by the North Carolina Supreme Court case relied upon by the *Metric* court, *Britt v. Britt,* 320 N.C. 573, 359 S.E.2d 467 (1987). In *Britt,* there was a dispute over a contract. Essentially, plaintiffs agreed to operate, repair, and maintain defendant's farm. *Id.* at 574–75, 359 S.E.2d 467. In exchange, defendant permitted plaintiffs to live on the farm and to retain any surplus income as compensation after the payment of certain mortgage notes. *Id.* at 575, 359 S.E.2d 467. Defendant also agreed that if plaintiffs "hit the diamond level" of sales, defendant would convey the farm to plaintiffs if they repaid to him his investment in the farm. *Id.* at 574–75, 359 S.E.2d 467.

The arrangement fell apart and plaintiffs brought suit against defendants for, among other things, unjust enrichment. *Id.* at 576, 359 S.E.2d 467. Plaintiffs sought to recover the reasonable value of their personal labor and services, as well as reimbursement for the mortgage payments and the amount they expended in repairs and maintenance. *Id.* The jury awarded plaintiffs approximately $360,000 on the unjust enrichment claim. *Id.*

The North Carolina Supreme Court vacated the jury award and remanded the case for a new trial on the issue of unjust enrichment. *Id.* at 581, 359 S.E.2d 467. The North Carolina Supreme Court held that the trial court erred in permitting evidence as to these damages as plaintiffs were already compensated for them via the contract, i.e., plaintiffs were already contractually obligated and compensated

for operation of the farm, the repairs and improvements, and payment of the note. *Id.* at 577–78, 359 S.E.2d 467. ·Like *Metric, Britt* decided that unjust enrichment damages are available only for services that plaintiffs have not yet been compensated for. *Id.* at 578, 359 S.E.2d 467. Neither case has anything to do with the issue before the Court, the apportionment of profits or separating out the contributions of other parties.

The case of *Fed. Deposit,* 755 F.Supp. 1314, is similarly inapposite. In that case, defendant corporation fraudulently sold assets to a third party. *Id.* at 1324. Plaintiff, a judgment creditor of defendant, brought suit for unjust enrichment against defendant for the loss associated with the fraudulent sale. *Id.* The court held that the plaintiff did not have standing to pursue the unjust enrichment claim because in a claim for unjust enrichment, "[i]t is usually necessary for the plaintiff to show that *he* conferred the benefit to the defendant." *Id.* (emphasis in original) (quoting *Scanwell Labs., Inc. v. Thomas,* 521 F.2d 941, 949 (D.C.Cir.1975)).

Defendant contends that *Federal Deposit* stands for the proposition that "in quantifying the amount of benefit conferred in an unjust enrichment case, an expert must separate and apportion the benefit provided by the plaintiff from other contributions made by third parties or the defendant." (Def.'s Br. 7.) The Court disagrees with defendant's interpretation. Like *Metric* and *Britt, Federal Deposit* had nothing to do with the apportionment of defendant's profits because of another party's contributions. Rather, the issue before the *Federal Deposit* court was whether a creditor, who has not itself conferred a benefit on defendant, has standing to pursue an unjust enrichment claim. In other words, the issue was whether plaintiff could properly bring a suit at all. In contrast, in the case before the Court, the issue is how

much a plaintiff, whose standing is not challenged, can recover from defendant in light of contributions from other parties. Thus, *Federal Deposit* is unhelpful in deciding the apportionment issue presently before the Court.

The Court, however, does finds guidance as to how the North Carolina Supreme Court would decide this matter in the case focused on by plaintiff: *Rhone–Poulenc Agro, S.A. v. Monsanto Co.,* Civ. A. No. 97–1138, 2000 U.S. Dist. LEXIS 21330 (M.D.N.C. Feb. 8, 2000), *aff'd,* 345 F.3d 1366 (Fed.Cir.2003). In *Rhone–Poulenc,* plaintiff and defendant DeKalb Genetics Corporation worked together to create genetically-altered corn that was resistant to glyphosate, an active ingredient in weed-killing herbicides. *Id.* at *5–7. Plaintiff performed the initial genetic work by creating various genetic constructs, later named "RD–125." DeKalb then "transformed" corn cells by placing plaintiff's constructs into cells and growing full corn plants. *Id.* at *7. "Neither party had the ability to perform the other party's role in this collaboration, and both roles were necessary in order to produce glyphosate resistant corn." *Id.*

DeKalb succeeded in growing the transformed corn plants, but allegedly did not fully disclose its success to plaintiff and misappropriated plaintiff's contributions. *Id.* at *11–13. The collaborative effort eventually resulted in corn seeds that were commercialized and marketed by DeKalb under the brand name "Roundup Ready." *Id.* at *13.

Plaintiff sued DeKalb for unjust enrichment based upon fraud. *Id.* at *161. Plaintiff sought disgorgement of DeKalb's profits from the sale of "Roundup Ready" corn. *Id.* at *163. Plaintiff offered expert opinion testimony that DeKalb received $21.8 million because of "Roundup Ready" corn from trait premiums, a growing-cost

subsidy, and incremental sales. *Id.* at *171. The expert did not apportion the respective parties' contributions in developing RD–125.[3] *Id.* The trial court instructed the jury that,

> unjust enrichment is a very broad and flexible doctrine recognized in the law. It has its basis the principle that it is contrary to equity and good conscience for a defendant to retain a benefit which has come to him at the expense of the plaintiff.... In considering whether the doctrine should be applied in a particular case, all the facts must be examined to determine whether circumstances render it "just or unjust, equitable or inequitable, conscionable or unconscionable," to apply the doctrine. The appropriate remedy when a party has been unjustly enriched at the expense of another is to award the injured party all of the profits attributable to the unjustly retained benefit.

*Id.* at *170. The jury awarded plaintiff $15 million for unjust enrichment. *Id.* at *162.

The verdict was upheld by the *Rhone–Poulenc* court, holding that "[the] verdict does not contradict North Carolina law, is in accord with general principles of restitutionary remedies, and is supported by substantial evidence." *Id.* The court held that in order to determine how much DeKalb unjustly benefitted from its use of plaintiff's contributions, the jury should be instructed as to

> general considerations of fairness, taking into account the nature of the defen-

dant's wrong, the relative extent of his or her contribution, and the feasibility of separating this from the contribution traceable to plaintiff's interest.... The more culpable the defendant's behavior, and the more direct the connection between the profits and the wrongdoing, the more likely that the plaintiff can recover all defendant's profits.

*Id.* at *169 (quoting *EarthInfo, Inc. v. Hydrosphere Res. Consults., Inc.*, 900 P.2d 113, 119 (Colo.1995)). The court recognized that "[b]y not granting [plaintiff] all of the $21.8 million calculated by [plaintiff's expert], the jury's award appropriately credits DeKalb for its role in producing Roundup Ready corn; however, it also recognizes the substantial evidence that demonstrated Roundup Ready corn would not be resistant to glyphosate without RD–125." *Id.* at *171–72.

*Rhone–Poulenc* is almost directly on point. In *Rhone–Poulenc,* plaintiff sought defendant's profits attributable to the wrongfully-obtained benefit. Plaintiff's contribution when combined with defendant's contribution resulted in the development of RD–125, the distinguishing additive of "Roundup Ready" corn. Plaintiff's expert testified as to the total increase in the amount of defendant's profits attributable to the development of RD–125. The expert did not attempt to apportion the respective parties' individual contributions in developing RD–125. The jury, with the total figure at hand, was properly instructed as to the equitable principles of unjust

---

**3.** Prior to the development and marketing of "Roundup Ready" corn, defendant had, without contribution from plaintiff, developed and marketed a normal, non-glyphosate-resistant corn seed. The expert recognized that DeKalb charged an additional $18 per bag premium for the trait of glyphosate resistance on top of its price for normal, non-glyphosate-resistant corn seed. *Id.* at *171. While the expert discounted sales for the portion of

"Roundup Ready" corn not attributable to RD–125, i.e., non-glyphosate-resistant corn seed, the expert did not apportion the contribution that defendant made to the development of RD–125. While the contributions of both plaintiff and defendant were necessary to the development of RD–125, the expert testified that plaintiff was entitled to full profits derived from the $18 mark-up.

enrichment, principles that ask the jury to consider, among other fairness factors, the relative extent of plaintiff's contributions.

The instant case presents the same factual pattern as *Rhone–Poulenc*. Plaintiff seeks defendant's profits attributable to the wrongfully-obtained benefit. According to plaintiff, his contribution was "necessary" to the development of Lucentis, albeit without the efforts of defendant and third-parties, Lucentis would not have come to fruition. In other words, plaintiff's contribution, when combined with the contributions of defendant and third-parties, resulted in the final product, Lucentis. As in *Rhone–Poulenc*, Mr. Gemini should be permitted to testify as to the total value of Lucentis. The jury, with the total figure at hand, will be properly instructed as to the equitable principles of unjust enrichment, principles that ask the jury to consider the relative extent of plaintiff's contributions as well as other factors of fairness.

As such, the jury will be asked to evaluate the appropriate damages remedy in light of the purposes of unjust enrichment—to disgorge the profits that would be inequitable for defendant to retain—and in making that determination, the jury may consider numerous equitable factors, including but not limited to, the relative extent of plaintiff's contributions. In addition to the jury charge, defendants have the opportunity to bring these issues to the attention of the jury in cross-examination of Mr. Gemini.

Mr. Gemini's testimony, however, may not proceed unbridled. Mr. Gemini may not opine that (1) plaintiff's submissions were critical to Genentech's project to develop an anti-VEGF drug for the treatment of AMD,[4] or (2) that the estimated value reached by Mr. Gemini constitutes the wrongfully-obtained benefit subject to disgorgement as unjust enrichment damages.[5] These opinions exceed Mr. Gemini's expertise as an expert economist. Mr. Gemini is restricted to an opinion on the economic value that he places on plaintiff's contribution, or in this case, defendant's profits. Mr. Gemini may similarly offer his opinion as to his stock analysis which corroborates the value placed on Lucentis, as well as the speed-to-the-market theory, as these opinions satisfy the requirements of Rule 702.

### B.  *Fraud and Unfair Trade Practices*

■ Defendant argues that Mr. Gemini's opinions with respect to the fraud and unfair trade practices claims should be excluded because he calculates the benefit of the bargain, when the proper calculation is reliance damages because his claim is based on an unenforceable promise.[6] (Def.'s Br. 23, 25.) Defendant directs the Court to the North Carolina Supreme Court case of *Britt*, 320 N.C. 573, 359 S.E.2d 467.

The support that defendant seeks from the *Britt* decision is ill-founded. The select extraction of several sentences from *Britt* that defendant inserted in its brief is misleading to the Court in that the selected quotation is taken out of context and does not stand for the proposition claimed

---

4.  In offering his opinion as to damages, Mr. Gemini must inform the jury that he is assuming this fact to be true, not that, in his opinion, it is true.

5.  As the Court decided with respect to defendant's expert economist, David Kaplan, Mr. Gemini may testify as to the value of the benefit conferred on defendants, but he may not testify as to said value's impact on damage calculations.

6.  The Court has never decided that the alleged agreement was unenforceable. The Court also does not find that plaintiff's voluntary dismissal of the contract claim is dispositive as to this issue.

by defendant. Defendant inserted the following in its brief:

> The plaintiff has not sued for breach of contract which she could have done for the failure of [defendant] to have the stock issued to her. Her claim is for fraud. The gravamen of a claim for fraud is the damage to a person for a change in position based on the reliance on a false statement. The damage is caused by this change of position and not the lost bargain.

(Def.'s Br. 25) (quoting *Britt*, 359 S.E.2d at 471–72.)

> The full passage, however, reads:

> The appellant contends she has been injured by not receiving the stock in the corporation [defendant] told her he was forming. This argument raises the question of whether the plaintiff in a claim for fraud may recover damages for the loss of a bargain. As far as we can determine, this is a question of first impression in this jurisdiction. There have been cases from other states dealing with this problem. *The plaintiff has not sued for breach of contract which she could have done for the failure of [defendant] to have the stock issued to her. Her claim is for fraud. The gravamen of a claim for fraud is the damage to a person for a change in position based on the reliance on a false statement. The damage is caused by this change of position and not the lost bargain.* There is a split among the jurisdictions which have decided this question. A majority allows damages for the lost bargain as well as for the change in position. A minority limits damages to that caused by a change in position. We do not have to choose in this case between the majority and minority rules [because plaintiff has not shown that she was damaged by defendant's fraud.]

*Id.* at 471–72 (citation omitted) (emphasis added).

So, in fact, the *Britt* court explicitly did not decide whether a plaintiff claiming fraud is precluded from benefit-of-the-bargain damages and may only recover reliance damages. Rather, in a statement that is unfavorable to defendant's position, the court recognized that a majority of the jurisdictions allow recovery under both theories, although it did not have to make a decision in the case before it. This sleight-of-hand advocacy will not be helpful to defendant's case.

Since *Britt*, at least one North Carolina appellate court has concluded that a plaintiff may recover "loss of bargain damages" in a fraud action so long as plaintiff establishes "(1) that the damages are the natural and probable result of the tortfeasor's misconduct and (2) that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty." *See Leftwich v. Gaines*, 134 N.C.App. 502, 521 S.E.2d 717, 724 (1999); *see also Winant v. Bostic*, 5 F.3d 767, 776 (4th Cir.1993) (holding that damages for fraud "is the value of the loss caused by the tortious conduct, and it is measured by the difference between what was received and what was promised by the false representation"). Contrary to defendant's assertion that benefit-of-the-bargain damages under North Carolina law are limited to cases "involv[ing] charges of fraudulent inducement to a contract where there was no question as to the enforceability of the underlying contract," (Def.'s Reply Br. 5) *Leftwich* is not a fraudulent-inducement case.

The Court further finds that benefit-of-the-bargain damages in a case of fraud is consistent with the underlying purpose of a fraud recovery, to put the plaintiff "in the same position as if the fraud had not been practiced on him." *Godfrey v. Res–Care, Inc.*, 165 N.C.App. 68, 598 S.E.2d 396, 404 (2004) (quoting *Sykes v. Life In-*

*sur. Co. of Va.*, 148 N.C. 13, 61 S.E. 610, 612 (1908)). Thus, Mr. Gemini may offer his opinion as to benefit-of-the-bargain damages, i.e., the total present value of the expected royalty stream.

## III.  CONCLUSION

For the foregoing reasons, defendant's motion to exclude the opinion testimony of Mr. Gemini is granted in part and denied in part.  Mr. Gemini may offer opinions in accordance with this Memorandum.  An appropriate order follows.

### *ORDER*

**AND NOW,** this **10th** day of **July, 2006,** it is hereby **ORDERED** that defendant's motion in limine no. 1 to exclude the expert testimony of Joseph Gemini (doc. no. 110) is **GRANTED IN PART** and **DENIED IN PART.** Mr. Gemini may offer his opinion in accordance with the attached Memorandum.

**IT IS FURTHER ORDERED** that defendant's motion for leave to file a supplemental memorandum (doc. no. 162) is **GRANTED.**

**AND IT IS SO ORDERED.**